## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LORRAINE MCKEAGE,<br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>KILOLO KIJAKAZI,[1]<br>Acting Commissioner,<br>Social Security Administration,<br>　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION**<br>**NO. 21-11683-TSH** |

## REPORT AND RECOMMENDATION

### February 8, 2023

Hennessy, M.J.

The Plaintiff, Lorraine McKeage, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ").[2]  [Dkt. No. 14].  The Commissioner seeks an order affirming her decision.  [Dkt. No. 17].  By Order of Reference dated October 4, 2022, pursuant to 28 U.S.C. § 636(b)(1)(B), [Dkt. No. 19], this matter was referred to me for a Report and Recommendation on these two motions, which are now ripe for adjudication.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted as the defendant in this matter.

[2] In general, the applicable legal standards are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

For the reasons that follow, I RECOMMEND that McKeage's Motion to Remand the Commissioner's Decision [Dkt. No. 14] be DENIED and Defendant's Motion to Affirm the Commissioner's Decision [Dkt. No. 17] be GRANTED.

## I.   BACKGROUND

### A.   Procedural History

McKeage filed applications for DIB and SSI on January 30, 2020, alleging disability since February 21, 2019.[3] [Tr. p. 10].[4]  The applications were denied initially and upon reconsideration, on May 6, 2020 and August 5, 2020.  [Id.].  On August 12, 2020, McKeage requested an administrative hearing.  [Id.].  Following a hearing on November 25, 2020, the ALJ rendered a decision unfavorable to McKeage on December 14, 2020, finding she was not "disabled" under Section 1614(a)(3)(A) of the Social Security Act.  [Id. at p. 19].  On August 13, 2021, the Appeals Council notified McKeage that the ALJ's December 14, 2020, decision was final and ripe for judicial review.  [Dkt. No. 1 pp. 1-2].

Having timely pursued and exhausted her administrative remedies before the Commissioner, McKeage filed a complaint in this Court on October 15, 2021, pursuant to 42 U.S.C. § 405(g). [Dkt. No. 1].  McKeage filed the motion for reversal or remand on April 8, 2022, [Dkt. No. 14], and the Commissioner filed a cross-motion on June 20, 2022.  [Dkt. No. 17].

---

[3] This was not McKeage's first application for DIB and SSI; she had filed an application reporting depression, anxiety, PTSD, and diverticulitis on October 21, 2017, which was denied initially on February 21, 2018, and upon reconsideration on June 14, 2018.  [Tr. p. 73].  Following a January 28, 2019 hearing requested by McKeage, an ALJ found at the time that she did "not have an impairment or combination of impairments that meets or medically equals the severity" of those included under Appendix 1, and that she had the RFC to "perform a full range of work at all exertional levels."  [Id. at pp. 77-78].

[4] Conforming to the Parties' practice, all citations to the record ("Tr.") will refer to the Bates stamp pagination provided in the lower right corner of each page.

### B.      Personal History

At the alleged onset date of February 21, 2019, Smith was fifty-two years old.  [Tr. p. 39].
During the November 25, 2020 hearing, McKeage testified that she lived with her adult daughter,
who is employed, and minor granddaughter.  [Id.].  McKeage had no source of income.  [Id.].

McKeage obtained a GED after reaching the eleventh grade.  [Id. at p. 41].  McKeage had
previously worked full-time for CVS since 2008, where she was a telephone support worker for
customers seeking insurance and billing information.  [Id. at pp. 43-44].  Prior to that, she has been
employed as a pharmacist assistant at Aerotek, and as a telephone worker in the billing department
of a UMass Memorial affiliated clinic from about 2005.  [Id. at pp. 44-45].  McKeage stopped
working in 2016 at the onset of her diverticular disease, which she testified made it too difficult
for her to perform her duties.  [Id.].  In a February 20, 2019 decision, an ALJ reported that a CT
scan of McKeage taken in 2016 revealed "likely diverticulitis," [id. at p. 77], and that she
underwent a sigmoid colectomy to address related GI issues on March 21, 2017.  [Id. at p. 78].

McKeage testified that while she is literate, eyesight trouble prevents her from reading
properly.  [Id. at p. 41].  She also testified that she has trouble with numbers and basic arithmetic.
[Id. at p. 42].  While she has a driver's license, she had stopped driving around August 2019 as she
would "get too nervous[,]" and had experienced a couple of instances of memory loss while
driving.  [Id. at p. 40].  Until COVID-19 and appointments by telehealth, she would drive only to
doctor's appointments.  [Id.].

### C.      Medical Opinions

#### 1.      Whitinsville Clinic Reports

The record includes thirteen reports, from September 2018 through February 2020,
prepared by Whitinsville, a psychiatric care facility, [tr. p. 16], following monthly psychiatric

assessments of McKeage.  [Id. at pp. 410-38].  A report dated January 31, 2019 provides some medical history, including "Hx Diverticulosis, GI reflux & GERD, headaches, [and] high cholesterol" under "Physical Health History[,]" and notes only post-traumatic stress disorder ("PTSD") under "Diagnosis."  [Id. at pp. 434-35].  The report also indicates that a car accident first triggered McKeage's PTSD in 2005, that the condition "returned since being diagnose[d] with diverticulosis[,]" and that McKeage has had "difficulty with finding foods [she can] tolerate[].  She has many flare[-]ups [and] … cannot go far from [a] bathroom.  She has difficulty going on highways and can no longer work."  [Id. at p. 434].

The earliest Whitinsville report from September 2018, [id. at pp. 411-12], notes diagnoses of PTSD and agoraphobia; under "Assessed Needs and Goals[,]" the report notes "Risk (Suicidal Ideation)[,]  Mental  Health/Illness  Management-Behavior  Management  (Anxiety, Depression/Sadness, Coping/Symptom Management, Stress Management, Trauma)[,] Family and Social  Support  (Communication  skills)[,]  [and]  Activities  of  Daily  Living  (Medication Management)[.]"  [Id. at p. 412].  Diagnoses for PTSD and agoraphobia are the only two ever listed on the Whitinsville records that follow; the thirteen records include either both conditions, or only PTSD.  The records are also sparse; each contains approximately three sentences noting McKeage's self-reported physical and emotional state.  [See, e.g., id. at p. 420 (the October 31, 2019 report, which only lists PTSD, notes that McKeage "reports she has been medically ill and has pneumonia and has been on antibiotics.  She also has [an] ear infection and had fever and chills – has had difficulty with sleep due to ear pain.  She has been on antibiotics for past 10 days and feels much better.  She has been eating well and has been enjoying her family. …")].  Each report also provides a diagnosis; a yes-or-no questionnaire on whether there have been any "significant changes  reported  or  observed"  in  "Behavior/Functioning[;]"  "Medical  Condition[;]"

"Mood/Affect[;]" "Substance Use[;]" and "Thought Process/Orientation[.]" [See, e.g., id. at p. 421]. The reports also include a "Risk Assessment[,]" and enumerated "Therapeutic Interventions[,]" such as "emotional support, continue current medications, continue individual therapy, continue good sleep hygiene[.]" [See, e.g., id.].

Generally, the reports do not reflect any physical assessment of McKeage, other than her self-reported symptoms with an emphasis on her mood. In the last four months' worth of assessments, McKeage discusses the quality of her appetite in relation to GI distress. [See, e.g., id. at p. 416 (noting on December 27, 2019 that she "reports poor sleep and poor appetite and has been living on wonton soup"); id. at p. 420 (noting on October 31, 2019 that "[s]he has been eating well")]. To the extent she discusses diverticulosis-related symptoms from February 2019 to January 2020, McKeage's Whitinsville records indicate fluctuating improvement. Her February 28, 2019 report notes McKeage "has been struggling with her GI distress symptoms and frequent bathroom visits … [she] is hoping she can have corrective surgery and put a stent in bowel to assist with relief of her diarrhea and pain. … [s]he is eating well and has had visits with her son Billy." [Id. at p. 434]. Her July 18, 2019 report indicates McKeage had "been having a difficult time. She had a UTI and ended up in the ED for abdominal pain and resulted in diverticulitis exacerbation. … [s]he has been eating very bland foods and her condition is getting better." [Id. at p. 426]. McKeage's September 5, 2019 report notes that she "reports her diverticulitis is resolved finally and [she is] eating well … [s]he is able to eat many things again." [Id. at p. 424]. The final report from January 2020, notes that McKeage "reports that she is feeling better but still has difficulty with her hearing in left ear … her sleep and appetite are good and [she] has enjoyed spending time with family over holiday season … No safety risk issues." [Id. at p. 414].

### 2. Milford Gastroenterology Reports

The record also includes three reports prepared by Brett A. Hassan, M.D. at Milford Gastroenterology.  Dr. Hassan's first report dated October 3, 2018 notes that McKeage had, up to that date, been hospitalized three times in two years for diverticulitis,[5] had a "recurrence of abdominal pain in March 2017[,]" and was "diagnosed with complicated diverticulitis with associated abscess."  [Id. at p. 463].  The report further noted that despite a "segmental colectomy[,]" McKeage was experiencing "ongoing abdominal pain[.]"  [Id.].  Moreover, McKeage noted "intermittent" diarrhea, reporting she "can go multiple times in the morning[,]" and that "[b]lood will be present in the stool every other day[.]"  [Id.].  In discussing the results of a July 2016 CT scan, the 2018 report notes "inflammatory change in the descending colon and area with diverticulosis … [and] inflammation involving the sigmoid colon[,] … [but] [n]o evidence of complicated disease."  [Id. at p. 464].  Under "IMPRESSION[,]" Dr. Hassan noted that "[s]ome of her ongoing symptoms could certainly be related to irritable bowel syndrome [("IBS")]," and recommended a "high-fiber diet with fiber supplementation[.]"  [Id. at p. 465].

Dr. Hassan's July 2, 2019 report, a follow-up from October 2018, notes the results of her October 2018 colonoscopy indicated "multiple polyps, along with diverticular disease and a healthy-appearing colocolonic anastomiosis."  [Id. at p. 459].  Under "colonoscopy results," the record indicates the removal of several polyps, and "[d]iverticulosis in the entire examined colon." [Id. at 460].  The report noted that McKeage "complain[ed] of fairly frequent diarrhea … she has cut back on her dietary intake.  If she knows there is a place she needs to be, she may have only one meal a day … even with avoidance of [triggering] foods, she still experiences diarrhea[,]" which was only "mild[ly]" improved by taking dicyclomine.  [Id. at p. 459].  Dr. Hassan's recorded

---

[5] A later hospital report, dated June 26, 2019, is included in the record.  [Tr. pp. 586-88].  That report notes "sigmoid diverticulitis" and "abdominal wall hernias" under diagnoses, notes she her primary complaint was abdominal pain, and, under "nursing assessment[,]" notes that "left lower quadrant" tenderness and pain in the abdomen is "[a]ssociated with diarrhea."  [Id. at pp. 592-93].

"IMPRESSION" notes a seven-day course of antibiotics to address "a recurrence of acute uncomplicated sigmoid diverticulitis" and "acute onset of abdominal pain[,]" and notes that McKeage's "underlying diarrhea and abdominal pain" suggested underlying IBS.  [Id. at p. 462].

The last report, dated January 9, 2020, indicates "multiple complaints including abdominal pain, diarrhea, diverticulosis, colon polyps and reflux."  [Id. at p. 454].  Recording McKeage's self-reported symptoms, Dr. Hassan notes that while her diverticulosis-related pain had improved partly through medication, "[s]he does continue to complain of diarrhea … [which] is still an ongoing issue.[]  When it happens, [] [it] happens in the morning.  It does occur most days.  She rarely if ever will have a normal bowel movement."  [Id.].  Based on a physical exam and a June 26, 2019 CT scan, Dr. Hassan noted under "IMPRESSION" that "[i]n regard to her diverticulosis, she should continue to follow a high-fiber diet and consider fiber supplementation.  In regard to the abdominal pain and diarrhea, [he] [] suspect[s] a functional cause[,]" and noted McKeage "likely" suffers from IBS.  [Id. at pp. 457-58].  Moreover, Dr. Hassan noted that the June 2019 CT scan indicated "probable early acute sigmoid diverticulitis without perforation or abscess."  [Id. at p. 455].  The report noted the need for regular colonoscopy screenings, with McKeage's next exam scheduled for November 2021.  [Id. at p. 457].

### 3.    Family Continuity Reports

Though they were provided by "Family Continuity" rather than Whitinsville, the record also contains reports following monthly out-patient psychiatric check-ups between February and September 2020.[6]  [Tr. pp. 739-61].  A February 20, 2020 report lists PTSD and agoraphobia as McKeage's only two diagnoses.  [Id. at p. 759].  The report notes that McKeage stated she was

---

[6] Though it is not entirely clear from the reports, McKeage's Whitinsville Clinic and Family Continuity treatments are possibly connected, as these share the same "Billing Provider."  [See, e.g., Tr. 412 (January 2020 Whitinsville report), 745 (September 2020 Family Continuity report)].

"doing well" and "playing games and watching TV" with her granddaughter, who was on holiday. [Id.].  She also reported her sleep and appetite had recently been "variable."  [Id.].  However, an "Annual Update" prepared two days earlier, on February 18, 2020, indicated that McKeage "continues reporting feeling sick due to her diverticulosis flare-ups … [and] report[ed] anxiety feelings when going outside of her house."  [Id. at p. 761].

Monthly reports prepared from March through September 2020 reflect McKeage's regular mentions of GI distress and diverticulosis-related symptoms.  On March 19, 2020, McKeage "report[ed] ongoing … GI symptoms and difficulty with abdominal pain after eating … [but that] taking dicyclomine 4x daily before meals … has helped … [and] has prevented cramping and intense intestinal contractions[,]" and that she "has trouble sleeping because of the pain."  [Id. at p. 757].  On April 23, 2020 McKeage reported that her "appetite has been improved and [that she] continues to take Bentyl for GI distress with good effect[,]" [id. at p. 755]; less than a month later, on May 14, 2020, McKeage noted she "continues to suffer with abdominal pain and GI distress and continues with Bentyl and other medications and is to follow up with GI specialist soon."  [Id. at p. 753].  Similarly, the June 11, 2020 record "reports [McKeage] was in Milford ED for [c]hest pain and GI distress and acute abd[ominal] pain[,]" and, following an endoscopy, Dr. Hassan diagnosed McKeage with gastritis and "significant inflammation."  [Id. at p. 751].  A July 23, 2020 report notes that McKeage "continues to suffer from colitis … is []on medications for IBS, Crohns and colitis … [and] tests … report she has chronic inflammation in bowel."  [Id. at p. 749].  McKeage also stated she was "trying to stay out [of the] [] public due to her GI distress."  [Id.].

The last two reports from August and September 2020 indicate ongoing GI distress.  In August 2020, McKeage reported she had "been having great difficulty with gastritis and pain in chest … [and was] waiting for GI doctor to return her call[,] [as well as] difficulty sleeping over

past several nights due to anxiety from gastritis." [Id. at p. 747]. Moreover, she had "been trying to eat foods and figure out which are tolerated … [s]he has not eaten much dairy and has been eating gluten free[.]" [Id.]. In September 2020, McKeage reported "she ha[d] been having diarrhea and [was] still trying to stabilize her digestive system … [but] report[ed] good sleep and fair appetite." [Id. at p. 745].

### 4. UMass Memorial Reports

The record includes reports from eleven clinic visits at UMass Memorial dated 2014 to 2020 for a range of reported issues, with most dated prior to 2019. As the ALJ's analysis focused on McKeage's alleged post-February 2019 disability, only three visits remain plausibly relevant; however, they relate to ear infections and a UTI. [See tr. p. 476 (noting "unspecified acute noninfective otitis" in January 2020, and "acute suppurative otitis" in October 2019)]. A June 4, 2019 visit resulted in a "dysuria" diagnosis. [Id.].

### 5. Function Reports

#### a. March 4, 2020 Function Report

In a self-completed "Function Report" sent to the SSA as part of her application for benefits, McKeage described her impairments, symptoms, and the consequent limitations. [Tr. pp. 336-46]. McKeage reported that she "takes medications" daily but needs "assistance"; that she must "stay close to the bathroom due to diverticulosis" for the "first 4hrs" of the day, and suffers "diarrhea and pain[.]" [Id. at p. 336]. McKeage also reported that her daughter helps her shower, reminds her to bathe, cooks for her, and drives her to doctors' appointments. [Id. at p. 338].[7] McKeage self-reported significant limitations to her day-to-day functioning: she can walk only "a

---

[7] It is unclear in the report whether McKeage can drive at all. [Compare, tr. at p. 337 (indicating she cannot drive) with id. at p. 339 (indicating she "drive[s] a car" as well as "ride[s] in a car[,]" when she goes out for either weekly doctors appointments or monthly shopping trips, both accompanied)].

few steps" before needing to stop and rest, [tr. at p. 341]; can "sometimes" follow spoken instructions but gets confused, anxious, and forgetful; and can "count change" but is otherwise unable to manage finances.  [Id. at p. 339].  She notes that she limits her departures from home as she "ha[s] accidents going to the bathroom."  [Id. at p. 339].  McKeage reports she is limited to "fold[ing] clothes on occasion" for about one hour per week and accompanying her daughter to the grocery store one hour per month.  [Id. at pp. 338-39].

### b.    June 29, 2020 Function Report

The June 2020 Function Report generally follows the March 2020 report.  Regarding GI distress, McKeage reported that "[i]n the morning [she] ha[s] a hard time and need[s] to be close to a bathroom due to diverticulosis.  It can last part of the day or all day."  [Tr. p. 370].  She reports "a lot of stomach pain" and needing "frequent bathroom visits[.]"  [Id.].  The only notable differences between the two reports are that she reports having "stopped driving or going out alone[,]" and that she no longer accompanies her daughter on shopping trips, as her "mind goes blank so [she] would rather not do it."  [Id. at p. 373].

### 6.    Agency Opinions

### a.    March 2020 Agency Opinion, Initial Level

The first agency opinion, signed on March 30, 2020 by state psychologist Dr. Lois Condie, Ph.D., concludes that McKeage is "Not Disabled."  [Tr. pp. 93-104].  Dr. Condie considered reports from UMass Memorial, Whitinsville, Family Continuity, and Dr. Hassan.  [Id. at pp. 94-96].  Though Dr. Condie's summarized findings included Dr. Hassan's CT scan observations and McKeage's hospital record,[8] the Initial Level report lists only McKeage's mental health

---

[8] For instance, under "Findings of Fact and Analysis of Evidence[,]" the report acknowledges that the colonoscopy and polyp removal performed in November 2018 was "not successful[,]" and showed "Diverticulosis in the entire

impairments under "Adult Medically Determinable Impairments," ("MDI") namely "Trauma – and Stressor-Related Disorders;" "Depressive, Bipolar and Related Disorders;" "Neurocognitive Disorders[;]" and "Anxiety and Obsessive-Compulsive Disorders[,]" manifested in her difficulty concentrating, muscle tension, and sleep disturbance.  [Id.].  Dr. Condie concluded that only McKeage's "Trauma – and Stressor-Related Disorders" are "severe[;]" the remaining three MDIs are "Non Severe[.]"  [Id. at p. 99].  Dr. Condie also noted that she did not consider any "medical opinion from any medical source."  [Id. at p. 101].  With regard to the paragraph B criteria,[9] Dr. Condie concluded that McKeage's ability to "[i]nteract with others" is moderate, while the remaining three are marked as "mild" impairments.  [Id.].

Under "Additional Explanation[,]" Dr. Condie noted McKeage's history of anxiety and agoraphobia, triggered by a car accident in 2005.  [Id. at p. 100].  Dr. Condie further stated that, as reported by McKeage, she "has difficulty leaving the house, but [] attends family outings, attends appointments, and is planning a relocation due to feeling isolated … [and] spends time with family members, prepares meals, and completes chores."  [Id.].

In April 2020, Dr. Choi, a state agency physician, concluded at the "Initial Level" that McKeage suffered no severe physical impairments.  [Id. at pp. 97-98].

### b.      July 2020 Agency Opinion, Reconsideration Level

Two doctors, O'Sullivan and Doret, provided assessments of McKeage's medical records on reconsideration in July 2020.  McKeage was deemed "not disabled" on reconsideration.  [Tr. at p. 145].  Specifically, Dr. Doret affirmed Dr. Choi's finding of no severe physical impairments.

---

examined colon."  [Id. at p. 30].  The report indicates that a medical evaluation by Dr. Choi on April 24, 2020 revealed "prediabetes, obesity, GERD an[d] recent ear infection … [and] [n]o other medical limitation."  [Id. at p. 31].

[9] Paragraph B criteria are met when a claimant's disorder(s) result in an "extreme" limitation in any one of the following categories, or a "marked" limitation in any two of the following categories: (1) the ability to understand, remember, or apply information; (2) the ability to interact with others; (3) the ability to concentrate, persist, or maintain pace; and (4) the ability to adapt or managing oneself.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

[Id. at pp. 124-25].   Dr. O'Sullivan, however, found that all four psychiatric MDIs—namely: trauma, depression, "Neurocognitive Disorders," and anxiety—presented as "severe."   [Id. at p. 127].   Turning to the paragraph B criteria, however, the report affirmed Dr. Condie's finding that McKeage suffered only "moderate" limitations in all four categories.  [Id. at p. 127].

### D.      Hearing Testimony

At the November 25, 2020 hearing, McKeage's attorney stated that as of February 21, 2019, McKeage has suffered a "combination of impairments[,]" including diverticulitis and mental health issues.  [Tr. p. 37].  McKeage did not provide any medical opinions at that hearing, apart from "assessments from DPS" completed by Drs. O'Sullivan, Condie, Choi, and Doret.  [Id. at pp. 37-38].   In describing her symptoms, McKeage testified that she requires frequent bathroom breaks, and experiences "severe" lower back pain for which she has been prescribed daily medication.  [Id. at pp. 47-48].   On a pain scale of ten, McKeage testified that her back pain is generally a five or a six, but when experiencing a diverticulitis-related "flare-up[,]" the pain reaches ten.  [Id. at pp. 48-49].   McKeage stated that she had experienced two such infection-related "flare-ups" in the past year.  [Id. at p. 51].   She testified that on a bad day, she requires upwards of ten bathroom breaks; on a good day, about seven.  [Id. at p. 49].   McKeage also stated that in about 2017, a portion of her large intestine was removed, but that it mollified her diverticulitis symptoms for only eight months.  [Id. at pp. 50-51].

As to her mental health impairments, including depression, anxiety, PTSD, and agoraphobia, McKeage testified that those disorders make her "extremely nervous" and give her headaches.  [Id. at pp. 51-52].  Zoloft, Trazidone, and Prazosin, which she takes as prescribed, do not alleviate her symptoms and, she believes, cause headaches.  [Id. at p. 52].   She has been

experiencing memory lapses for about three years.  [Id. at pp. 52-53].  She has been meeting with a counselor weekly regarding her mental health impairments.  [Id. at p. 53].

McKeage stated that her memory lapses, frequent physical pain, and regular incontinence would be significant obstacles to her performing any past work, particularly full-time.  [Id. at pp. 53-54; 58-59].  McKeage testified that she generally cannot sit for more than thirty minutes.  [Id. at pp. 61-62].  Moreover, she experiences incontinence about three or four times a week due to her diverticulosis, and that incontinence and anxiety disrupt her sleep virtually nightly.  [Id. at pp. 53-54].  McKeage testified that she has not been able to do household chores for a while, and that her daughter helps her bathe as she has fallen in the shower twice, and has frequent dizzy spells.  [Id. at pp. 54-55].  McKeage does not get any exercise apart from walking around the house and cannot lift heavy objects.  [Id. at p. 62].  She testified she would probably not be able to manage her own bank account, which her daughter currently does.  [Id. at p. 56].  McKeage lastly testified that she does not participate in any activities or hobbies, other than occasionally visiting family when her daughter is able to drive her.  [Id. at pp. 57-58].

Christina Boardman, a vocational expert ("VE"), classified McKeage's past work as a billing clerk.  According to the VE, while McKeage would not be able to perform her past work, she could perform other jobs, such as office helper, routing clerk, or linen room attendant.  [Id. at p. 65].  However, the VE noted that accommodating breaks amounting to fifteen percent or more of the workday, such as for seven, five to fifteen-minute-long bathroom breaks, "would eliminate competitive employment."[10]  [Id. at pp. 66-67].

### E.    Administrative Decision

---

[10] It was not clear from the testimony how much time fifteen percent of the workday was meant to amount to; if, hypothetically speaking, a full workday is calculated as eight (8) hours, then fifteen percent of that workday would amount to seventy-two (72) minutes.

In his written decision, the ALJ conducted the familiar five-step sequential evaluation process to determine whether McKeage is disabled.  See 20 C.F.R. §§ 404.1520(a), 416.920(a); Goodermote v. Sec'y of Health & Hum. Servs., 690 F.2d 5, 6–7 (1st Cir. 1982).  The ALJ emphasized perceived inconsistencies in the record to support his conclusion that McKeage was not "disabled" on or before December 31, 2021—the date through which she had "sufficient quarters of coverage to remain insured[.]"  [Tr. pp. 10-11].

First, the ALJ considers the claimant's work activity and determines whether she is "doing substantial gainful activity."  20 C.F.R. §§ 416.920(a)(4)(i); 416.920(b).  If the claimant is doing substantial gainful activity, the ALJ will find that she is not disabled.  Id.  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 416.972(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized.  20 C.F.R. § 416.972(b).  The ALJ found that McKeage had not engaged in substantial gainful activity since February 21, 2019, the alleged onset date.  [Tr. p. 12].

Second, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe" and meets the duration requirement of twelve months.  20 C.F.R. § 416.920(a)(4)(ii); see 20 C.F.R. § 416.909.  The ALJ determined that McKeage had the following severe impairments: diverticulosis, depressive disorder, anxiety disorder, PTSD, and agoraphobia.  [Tr. p. 12].

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments in Appendix 1 to Subpart P of the Social Security Regulations ("Appendix 1").  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1 and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that McKeage did not

have an impairment or combination of impairments meeting, or medically equivalent to, one of the impairments listed in Appendix 1. [Tr. p. 13].

Fourth, the ALJ considers the claimant's "residual functional capacity" ("RFC") and the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). Whenever there is a determination that the claimant has a significant impairment, but not an Appendix 1 impairment, the ALJ must determine the claimant's RFC. 20 C.F.R. § 416.920(e). An individual's RFC is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments. 20 C.F.R. § 416.945(a)(1). The ALJ determined that:

> [McKeage] had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: would require convenient access to restroom; simple routine tasks; occasional interaction with public, coworkers; infrequent workplace changes gradually introduced; and no production-paced work.

[Tr. p. 15]. The ALJ found that McKeage is unable to perform any past work. [Id. at p. 18].

At the fifth and final step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy. 20 C.F.R. § 416.945(a)(4)(v). The ALJ determined that, based upon McKeage's RFC, age, education, and work experience, jobs exist in significant numbers in the national economy that she can perform. [Tr. p. 18]. Accordingly, the ALJ found that McKeage was not disabled at any time from February 21, 2019 through the December 14, 2020 date of the ALJ's decision. [Id. at p. 19].

## 1. Assessment of McKeage's Conditions

The ALJ commented at length on step three of the analysis before concluding that McKeage's several "severe impairments," including diverticulosis, depressive disorder, anxiety disorder, PTSD, and agoraphobia, fail to "meet[] or medically equal[] the severity" of those listed under Section 404. [Id. at p. 13]. Addressing McKeage's diverticulosis-related symptoms first,

the ALJ noted that the provision does not explicitly mention diverticulosis, or any impairments reflected in McKeage's medical records.  Weighing McKeage's record against listings 5.00 and 5.06,[11] the ALJ noted that while the statute lists "anemia, serum albumin, abdominal mass, perineal disease, involuntary weight loss, and need for supplemental daily enteral nutrition[,]" McKeage has not provided evidence she suffers any such impairments.  [Id. at p. 13].

Turning to McKeage's mental health diagnoses, the ALJ concluded that those disorders, under listings 12.04, 12.06, and 12.15,[12] whether weighed individually or in combination, do not satisfy the paragraph B criteria under the statute.  In other words, they do not "result in one extreme limitation or two marked limitations in a broad area of functioning" as needed to constitute a "disability."  [Id. at p. 13].  To support that conclusion, the ALJ relied significantly on the two "Function Reports" McKeage completed in March and June 2020.  [Id.].  As interpreted by the ALJ, the Function Reports, and the Whitinsville records, reflect only "moderate limitations" in the four paragraph B categories.  [Id. at p. 14].  The ALJ pointed out that McKeage "was able to drive a motor vehicle, … advised her physician that she cooked all meals for her family … [and was] able to fold clothes on occasion[.]"  [Id.].  Further, the ALJ noted McKeage could "count change … [and] sometimes follow spoken instructions[,]" even if she reported issues following written instructions.  [Id.].  Thus, as the ALJ found only "moderate limitations" in all four paragraph B criteria, rather than at least two "marked" limitations or one "extreme" limitation, he concluded the criteria were not satisfied.

---

[11] Under Appendix 1, listing 5.00 (and 105.00) covers Digestive System related disorders generally; 5.06 (and 105.6) cover inflammatory bowel disease and related conditions.

[12] 12.00 and 112.00 cover Mental Disorders, generally; 12.04 and 112.04 pertain to depressive, bipolar and related disorders; 12.06 and 112.06 to anxiety and obsessive-compulsive disorders; and 12.15 and 112.15 to trauma- and stressor-related disorders.

The ALJ also concluded that the paragraph C criteria[13] were not satisfied.  Specifically, the ALJ found McKeage's record does not reflect "a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of [her] daily life."  [Id.].  Further, the ALJ stated there is "no evidence" that changes to McKeage's daily routine have exacerbated her symptoms or impacted her functioning; indeed, the ALJ found McKeage "able to function outside the home, and … attend to all self-care tasks independently."  [Id.].

### 2.  Assessment of McKeage's RFC

The ALJ concluded that McKeage "has the residual functional capacity to perform a full range of work at all exertional levels" with certain non-exertional limitations.  [Tr. p. 15].  Those limitations include "convenient access to restroom; simple routine tasks; occasional interaction with public, coworkers; infrequent workplace changes gradually introduced; and no production-paced work."  [Id.].

The ALJ did not credit McKeage's testimony that she "could not work full-time because of depression, abdominal pain, [] confusion[,]" and had memory problems, could not sit for long stretches of time, and required "at least 10" daily bathroom breaks.  [Id.].  Rather, the ALJ cited Social Security Ruling, SSR 16-3p, 82 Fed. Reg. 49462 (Oct. 25, 2017) ("SSR 16-3p") in making his RFC analysis, namely (i) "determining whether there is an underlying medically determinable physical or mental impairment … that could reasonably be expected to produce the claimant's pain or other symptoms[,]" and, if so, (ii) "evaluat[ing] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related

---

[13] The paragraph C criteria are satisfied when a mental disorder is "serious and persistent" as supported by medical documentation; when a claimant relies "on an ongoing basis[] upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting[]" to diminish symptoms of that disorder; and when, despite diminished symptoms, claimant has "achieved only marginal adjustment[,] . . . mean[ing] that [claimant's] adaptation to the requirements of daily life is fragile[.]"  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

activities."  [Tr. p. 15].   While the ALJ found that McKeage's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms … [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the medical evidence and other evidence in the record … [and] are not substantiated or corroborated by other objective evidence."  [Id.].

The ALJ relied on the monthly Whitinsville reports dated from September 2018 through February 2020, Dr. Hassan's reports, and the Family Continuity Reports to reach his conclusion. Those records, the ALJ noted "indicated no significant changes in behavior/functioning, mood/affect, and thought process/orientation."  [Id. at p. 16].  Moreover, after McKeage reported gastrointestinal pain and "frequent bathroom breaks" in February 2019, clinical records again reflect that "she exhibited no changes in behavior, functioning, thought process, or orientation." [Id.].  Around the same time, when McKeage also reported increased depression, the Whitinsville records show McKeage was trying to "walk more" and cook frequently as that "made her happy[,]" and that by May 2019, McKeage reported "good sleep, appetite, … feeling less depressed[,]" and excited about a family visit.  [Id.].  The ALJ further noted that McKeage reported feeling "better with good sleep and appetite" through February 2020.  While she "continued to complain of abdominal pain" after February 2020, McKeage also reported that Dicyclomine and Bentyl "prevented cramping[,] intense intestinal contractions[,] … and GI distress" and her behavior, mood, thought process, and affect "presented with no significant changes[.]"  [Id.].

Reports from Dr. Hassan following McKeage's complaints of "abdominal pain, diarrhea, and diverticulosis" in July 2019 reflect a diagnosis of recurring acute uncomplicated sigmoid diverticulitis, and noted McKeage "had to modify her diet if she needed to leave the house[.]" [Id.].  However, the ALJ emphasized that the same report also reflected McKeage "had normal

range of motion and strength in the extremities[,]" and neither motor nor sensory deficits. Moreover, in a January 2020 follow-up assessment, McKeage reported an improvement in her abdominal pain, helped by taking Dicyclomine two to four times a day, "with only morning diarrhea on most days."  [Id.].  Lastly, a June 2019 assessment at the UMass Memorial Tri River Health Center revealed early acute sigmoid colon diverticulitis; by June 2020, an "upper GI endoscopy demonstrated only mild chronic duodenitis."  [Id. at pp. 16-17].  In sum, the ALJ emphasized that treatment records following February 2019 largely "did not indicate[] bowel frequency" and noted "Dicyclomine prevented cramping and intense intestinal contractions and Bentyl alleviated GI distress." [Id. at p. 17].  The ALJ further noted that longitudinal mental health records show "no significant changes in behavior/functioning, mood/affect, and thought process/orientation."  [Id.].  The ALJ articulated, in sum, that:

> [T]he record is inconsistent regarding the claimant's complaints of abdominal pain and excessive bowel movements.  For example, in February 2019, she reported GI pain and frequent bathroom breaks (Exhibit B1F, page 23).  However, subsequent treatment records did not indicate[] bowel frequency (Exhibit B1F, pages 3-4, 11, 13, 17, 21).  In addition, the claimant noted Dicyclomine prevented cramping and intense intestinal contractions and Bentyl alleviated GI distress (Exhibit B12F …; B8F). … [T]he record reflects that despite these difficulties and the claimant's allegations that she cannot work, the claimant is capable of performing tasks consistent with the residual functional capacity.

[Id.].  The ALJ also cited Agency opinions provided by Drs. Condie, O'Sullivan, and Doret regarding mental health.  The ALJ noted that the Agency opinions, which address only the paragraph B criteria, are consistent with the ALJ's RFC assessment.  For instance, Dr. O'Sullivan "opined that [McKeage] had mild limitation in the ability to understand, remember, or apply information, moderate limitation interacting with others, moderate limitation in the ability to concentrate, persist, or maintain pace, and moderate limitation in the ability to adapt or manage

[her]self."  [Id.].  Dr. Doret reported that McKeage's medical impairments were "non-severe[.]"  [Id.].

Turning to step five of the ALJ's disability analysis, while the ALJ concluded that McKeage "is unable to perform any past relevant work[,] … [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  [Id. at pp. 18-19].  Citing the VE's testimony, the ALJ noted that positions such as an office helper, routing clerk, or linen room attendant would address McKeage's non-exertional limitations and permit her to work.  [Id. at p. 19].  The ALJ thus found that McKeage "has not been under a disability" as defined by statute from February 21, 2019 through December 14, 2020.  [Id.].

## II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).  Therefore,

a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the claimant's burden to prove that she is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The claimant bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the claimant can perform.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## III.    ANALYSIS

### A.  The Alleged Effects of McKeage's Diverticulosis

McKeage first argues that workplace breaks and absences are required to address her documented medical impairments, that the necessity of such accommodations are "obvious to a layperson as a matter of common sense," and that the ALJ offered no objective evidence to support finding her subjective complaints unsubstantiated.  [Dkt. No. 14 at p. 18 (quoting Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990)].  More specifically, McKeage challenges the ALJ's finding that McKeage would not be off task at least fifteen percent of the workday, which the VE testified would render McKeage unemployable.  [Dkt. No. 14 at p. 17].  In response, the Commissioner characterizes McKeage's argument as premised on the notion the ALJ simply "should … have accepted at face value her testimony," which does not amount to a reversible error.  [Dkt. No. 18 at p. 9].  Moreover, the Commissioner stresses that "resolving factual disputes in the record is exclusively the province of the ALJ[,]" citing Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001), and that the ALJ's conclusion must stand as long as it is supported by

substantial evidence, no matter how many alternative resolutions may also be supported by the record.  [Id.].

Whether or not the ALJ accepted McKeage's testimony at face value, substantial evidence supports his determination of McKeage's non-disability.  Under the applicable standard, an ALJ's findings of fact "are conclusive when supported by substantial evidence, but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  It is not in this Court's purview to re-weigh evidence considered by the ALJ, as "the 'resolution of conflicts in the evidence' is done by the agency, not the judiciary."  Blackette v. Colvin, 52 F. Supp. 3d 101, 110 (D. Mass. 2014) (quoting Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir.1991)).

Here, McKeage argues that if the ALJ had accepted as true her testimony regarding the time she would be off task during a typical workday, then his step five determination that there were jobs McKeage could perform in the national economy would be at odds with the VE's testimony.  McKeage does not argue that the ALJ made a legal error, judged a matter entrusted to an expert, or "ignored" evidence.  Rather, she argues that the ALJ erred in finding McKeage's testimony "inconsistent" with her medical record, and consequently ascribing it little weight. Under the regulations, ALJs are explicitly admonished to:

> consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence, including [claimant's] history, the signs and laboratory findings, and statements by [claimant's] medical sources or other persons about how [claimant's] symptoms affect [her] … symptoms, including pain, will be determined to diminish [claimant's] capacity for basic work activities to the extent … functional limitations and restrictions due to symptoms … can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).  Thus, as argued by the Commissioner on appeal, McKeage essentially requests this Court to reweigh evidence considered by the ALJ, which this Court is not authorized to do.

Nevertheless, in light of the record, I find the ALJ had a sufficient basis upon which to be skeptical of McKeage's testimony as to the intensity, persistence, and limiting effects of her diverticulosis.  As a threshold matter, it is McKeage's burden to prove that she is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The claimant bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  McKeage's record demonstrates, as emphasized by the ALJ in his RFC analysis, the following:

- Dr. Hassan's October 2018 check-up noted that McKeage reported intermittent diarrhea, and "that she could go multiple times in the morning."  [Tr. p. 463].  Dr. Hassan recommended a colonoscopy and a high fiber, FODMAP diet.  [Id.].

- According to Whitinsville records, McKeage did not self-report "frequent bathroom visits" again following a mention in February 2019; "rather, she reported experiencing good sleep and appetite, as well as cooking, exercising, spending time with her family."  [Dkt. No. 18 at p. 3; Tr. pp. 426-30].

- McKeage reported to Dr. Hassan in July 2019 that medications, particularly Dicyclomine, "mildly" improved her "fairly frequent" diarrhea.  [Dkt. No. 18 at p. 4; Tr. p. 459].

- In September 2019, McKeage reported at a psychiatric check-up at Whitinsville that her diverticulitis had "resolved;" at her October 2019 Whitinsville check-up, she reported a healthier appetite and cooking for her family.  [Tr. p. 424]

- January and February 2020 psychiatric check-ups indicate McKeage reported she was doing well, with good sleep and appetite; she indicated in January 2020 that her diarrhea occurred primarily in the morning.  [Id. at pp. 414; 759].

- On April 23, 2020 McKeage reported that her "appetite has been improved and [that she] continues to take Bentyl for GI distress with good effect." [Id. at p. 755]

- At McKeage's most recent psychiatric check-ups with Family Continuity, in August and September 2020, she indicated "great difficulty with gastritis[,]" difficulty ascertaining which foods she tolerated without triggering GI distress, and, as of September 2020, "ha[d] been having diarrhea and [was] still trying to stabilize her digestive system … [but] report[ed] good sleep and fair appetite."  [Id. at p. 745].

McKeage's record unequivocally supports her diagnosis of diverticulosis, and the related symptom of diarrhea.  However, aside from her testimony, no report in McKeage's record indicates a particular number of daily bathroom visits or the amount of time she spends in the bathroom daily.  Instead, her medical record at several points reflects improvement of McKeage's GI symptoms with the help of medications, and generally a normal or healthy appetite.  Given that McKeage bore the evidentiary burden to establish her RFC, I find that the ALJ had substantial evidence upon which to find McKeage's testimony regarding the intensity, persistence, and limiting effects of her symptoms inconsistent with and unsupported by her medical record.

However, even if the ALJ had accepted at face value McKeage's testimony regarding the effects of her GI symptoms, and in particular the time she would require for bathroom breaks, he would have had substantial evidence upon which to determine she is not disabled.  In purely arithmetical terms, if the ALJ had accepted that McKeage needed seven to ten bathroom breaks daily, for a total of seventy-two minutes on average, her testimony does not indicate that those seventy-two minutes would all fall within the window of an eight-hour workday, or cause her to be off task fifteen percent of the workday.  For instance, McKeage's record suggests her bowel frequency is primarily a morning issue, [tr. pp. 454, 463, 336, 370]; McKeage also testified that bowel frequency symptoms occasionally interrupt her sleep.  [Id. at pp. 53-54].  If the seventy-two minutes of daily bathroom time are then reasonably considered within a twenty-four-hour window, rather than an eight-hour workday window, it is dubious whether her bathroom break accommodations would be preclusive of work.  Therefore, even accepting McKeage's testimony as to the number and duration of bathroom breaks in a day, the record would support the ALJ's

24

determination that her symptoms would not bar her ability to work.  As this Court has the prerogative to affirm an ALJ's determination where it finds only harmless error, I submit that any alleged error in the ALJ's consideration of McKeage's testimony does not amount to reversible error.  See Hoag v. Saul, 531 F. Supp. 3d 462, 466 (D. Mass. 2021) (affirming an ALJ's determination that claimant was not disabled, as the ALJ's omission of a state agency physician's limitations from the RFC analysis would not have changed the work alternatives proposed by the VE); see also Bennett v. Berryhill, 256 F. Supp. 3d 93, 98-99 (D. Mass 2017) (finding that the ALJ's failure to address a doctor's opinion that claimant had limited standing and walking abilities harmless error where claimant still would not be disabled if limited to sedentary work).

### B.  "Subjective Evidence" of McKeage's Diverticulosis

McKeage relatedly argues that the ALJ did not adequately consider her "subjective" complaints, whether or not they were substantiated by the record, in violation of SSR 16-3p.  Addressing this point briefly, there is nothing in the ALJ's opinion that facially indicates a misapplication of SSR 16-3p, and nothing in the text of SSR 16-3p that obliges an ALJ to weigh "subjective" evidence separately from the full record.  In clarifying SSR 16-3p's directives, the First Circuit has noted that:

> [U]nder SSR 16-3p … an ALJ determining whether an applicant has a[n RFC] that precludes a finding of disability must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." … SSR 16-3p provides that, in conducting that inquiry, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."

Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018) (quoting SSR 16-3p) (other internal citations omitted).  McKeage emphasizes that SSR 16-3p provides that "[i]n determining whether there is

an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, we do not consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence." [Dkt. No. 14 at p. 20]. However, this is a misapplication of the two-step RFC analysis delineated under SSR 16-3p. While an ALJ, under the regulation, should not "consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence" at step one—in other words, in determining whether or not there is an underlying MDI—once an MDI has been determined by "objective medical evidence," an ALJ at step two "will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence." SSR 16-3P; see also 20 C.F.R. § 404.1545(a)(3) (providing that when assessing a claimant's RFC, an ALJ considers all the relevant medical evidence, including opinions, treatment notes, and subjective allegations).

Thus, I find no error in the ALJ's consideration of consistency between McKeage's statements and the "objective" medical record and would not remand this matter on this ground.

### C.  The Severity of McKeage's Mental Condition

McKeage's final argument concerns the ALJ's finding of non-disability on account of her mental health impairments, despite "moderate" limitations in all four paragraph B criteria. In McKeage's estimation, the ALJ failed "to adequately and accurately take into account the totality of the interactions between these areas and fails to render an appropriate RFC that reflects them all." [Dkt. No. 14 at p. 21]. In support of her argument, McKeage cites to Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003) for the proposition that finding moderate limitations in all four paragraph B criteria "leave[s] open questions about [a claimant's] ability to comprehend and act

upon notice."  [Id. at p. 22].  Significantly, Byam—an SSI and DIB claimant—raised her mental assessments and related RFC in the context of due process issues with her application process. The Second Circuit distinguished between evaluations "assess[ing] Byam's mental state in the context of her employability[,]" (as relevant to McKeage), "rather than of her ability to act upon legal notice."  Byam, 336 F.3d at 182.  Thus, the question before the Second Circuit was "not whether Byam could understand and act upon instructions in the context of certain jobs, but whether she was impaired in her ability to understand and pursue administrative and legal procedures."  Id. at 182-83; see also id. at 183 ("Depression and social phobia might not prevent one from holding certain jobs, but they may impede one's ability to act on notice or go to a hearing.").

In short, there is no legal basis on which to remand the ALJ's determination on this ground. The regulations are clear that a "marked" limitation in two of the four areas of mental functioning, or "extreme" limitations in one, are indicative of a disability.  See 20 C.F.R. § Pt. 404, Subpt. P, App. 1., § 12.00(A)(2)(b).  "Moderate" limitations do not warrant a finding of disability, and Byam does not suggest a different reading of the regulation.

## IV.    CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that McKeage's Motion to Remand the Commissioner's Decision [Dkt No. 14] be DENIED and Defendant's Motion to Affirm the Commissioner's Decision [Dkt No. 17] be GRANTED.[14]


/s/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[14] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).